## UNITED STATES DISTRICT COURT
## FOR NORTHERN DISTRICT OF GEORGIA
## (ATLANTA DIVISION)

| | |
|---|---|
| JOSEPH C. CANOUSE, an individual<br><br>Plaintiff,<br><br>vs.<br><br>AMERICAN PREMIUM WATER CORPORATION., a Nevada Corporation, and ALFRED CULBRETH, an individual<br><br>Defendants. | Case No.:<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff Joseph C. Canouse ("Canouse"), by and through his attorney, and for his Complaint alleges as follows:

### JURISDICTION AND VENUE

1.

This Court has jurisdiction over all causes of action asserted herein pursuant to 28 U.S.C. § 1332, because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.  Venue and personal jurisdiction in this District are proper by virtue of the parties' express agreements. Additionally, the contracts at issue was created and executed at the Georgia

office of Defendant.  Additionally, jurisdiction and venue are proper as a result of the commission of tortuous conduct being directed into and resulting in damage in Georgia.

## PARTIES

2.

Canouse is an individual, a citizen of the State of Georgia.

3.

Defendant American Premium Water Corporation ("APWC") is, upon information and belief, a Nevada Corporation with its principal place of business in Del Ray Beach, Florida.  APWC may be served with process via its registered agent Incorp Services, Inc., 2360 Corporate Circle, Suite 400, Henderson, Nevada, 89074-7722.

4.

Defendant Alfred Culbreth is an individual who, upon information and belief, resides at 4045 Sheridan Avenue, Miami, FL 30341.

## AGREEMENTS, SHARES AND NOTES

5.

In early September, 2012, Mr. Canouse was appointed an officer and director of the entity now known as American Premium Water Corporation.

At that time, Mr. Canouse was issued 3 million shares of Series A Preferred S Stock ("Preferred Shares").

6.

The Preferred Shares were issued and Mr. Canouse has possession of the certificates for same.

7.

Pursuant to the Series A Preferred Stock Designation of Expert Group, Inc. (now known as APWC) ("Designation"), Preferred Shares convert into common stock ("common") at a rate of one (1) Preferred Share to one hundred (100) common shares.  A true and correct copy of the Designation is attached hereto as Exhibit A.

8.

Preferred Shares are, *inter alia*, not dilutable, carry voting rights, notice rights for meetings, and "shall receive dividends at a rate of twelve (12) percent per annum."

9.

In addition to the original Preferred Shares, during the term of his relationship with APWC, Canouse was issued certain other shares and promised certain compensation pursuant to certain written agreements.

10.

In February, 2013, a dispute arose between Culbreth and Canouse.

11.

Ultimately, the dispute resulted in Canouse agreeing to leave APWC.

12.

In February, 2013, Mr. Canouse entered into a Separation Agreement with APWC.

13.

The Separation Agreement provided for Mr. Canouse's departure from APWC and re-affirmed certain prior obligations already owed by APWC to Canouse pursuant to pre-existing written agreements. A true and correct copy of the Separation Agreement is attached hereto as Exhibit B.

14.

Paragraph 4 of the Separation Agreement refers to two convertible notes for accrued wages, each in the face amount of $30,000, which were provided to memorialize debt created pursuant to the Employment Agreement. These obligations already existed independently at the time of the Separation Agreement. The Notes are attached to the Separation Agreement and require the application of Georgia law.

15.

The $60,000 debt evidenced by the notes converted to shares at a 90% discount.

16.

Additionally, as re-affirmed by the Separation Agreement, the Corporation was obligated to issue an additional 1,175,000 Preferred Shares to Mr. Canouse with an issuance date of March 31, 2013.  The obligation to issue these shares already existed independently of the Separation Agreement.

17.

Thus, based upon his association with from APWC,  and as re-affirmed by the Separation Agreement, Canouse owned, less any honored conversions, 3 million Preferred Shares, two convertible notes each with a face value of $30,000, and an additional 1.175 million Preferred Shares.

18.

Moreover, for one year after Canouse's separation, APWC was obligated to "issue no more than twenty million" Preferred Shares.

## SUCCEFUL CONVERSIONS

### 19.

In about September, 2013, Canouse requested conversion of 1 million Preferred Shares into 100 million common shares.

### 20.

The September 2013 conversion request was honored by APWC.

### 21.

In about November, 2013, Canouse requested conversion of 1 million Preferred Shares into 100 million common shares.

### 22.

The November 2013 conversion request was honored by APWC.

## EXPRESS PROMISE TO HONOR FUTURE CONVERSION

### 23.

In early 2014, APWC continued to avail itself of Canouse's offices for receipt of certain mail, including certain invoices.

### 24.

At the time the Separation Agreement and related documents were executed, APWC maintained its office in Georgia.  The Separation Agreement was also drafted and executed in Georgia.

25.

Near the end of February, 2014, OTC Markets sent an invoice to Mr. Canouse for APWC.

26.

At that time, Canouse was no longer affiliated with APWC, but continued to be helpful.

27.

In a series of texts and emails, Mr. Culbreth, acting on behalf of APWC, asked Canouse to pay the roughly $2000 invoice with a promise of reimbursement.

28.

Canouse had no legal obligation to pay the OTC Markets invoice for Culbreth or APWC.

29.

During those conversations, Canouse gave notice that he would soon give an additional conversion notice based upon his notes, and was assured by Mr. Culbreth that after paying the invoice there would be no problem with the conversion.

30.

On or about February 19, 2014, Mr. Canouse paid the OTC Markets bill for APWC as requested by Culbreth expecting reimbursement and rapid turnaround of his upcoming conversion notice..

31.

On February 25, 2014, Canouse gave notice of conversion of $15,000 from a Convertible Note into 150,000 common shares.  To date, APWC has failed and refused to honor that conversion.

**REJECTED AND IGNORED CONVERSION NOTICES**

32.

On May 29, 2014, Mr. Canouse gave notice of conversion of 5,000 Preferred Shares to 500,000 common shares.

33.

On June 3, 2014, Mr. Canouse gave notice of conversion of 4,000 Preferred Shares to 400,000 common shares.

34.

Both the May 29, 2014 and June 3, 2014 notices of conversion were ignored by APWC.

## APWC AND CULBRETH TARGET CANOUSE

### 35.

APWC refuses to honor Canouse's conversion notices as described above.

### 36.

Nevertheless, APWC and Culbreth are allowing friends and family of Culbreth to convert and otherwise freely sell their shares.

### 37.

Upon information and belief, APWC and Culbreth are issuing shares in APWC to repay debts owed by Culbreth personally or through other non-APWC affiliated entities.

## DAMAGES SUFFERED BY CANOUSE

### 38.

To sell his shares, Canouse must first convert the Preferred Shares or notes into common shares at the applicable rate/discount.

### 39.

The shares issued to Canouse as the result of a conversion will bear a restrictive legend preventing trading.

40.

Once in possession of the shares with the restrictive legend, Canouse must hire counsel to issue a legal opinion concerning removal of the legend. Once the legal opinion is issued, Canouse would then send the legal opinion and common shares to APWC's transfer agent for removal of the legend.

41.

Upon removal of the restrictive legend, Canouse would then be free to sell his shares.

42.

The process from notice of conversion through and including removal of the restrictive legend typically take fifteen (15) business days.

43.

On February 25, 2014, Canouse gave notice of conversion of $15,000 from a Convertible Note into 150,000 common shares.  To date, APWC has failed and refused to honor that conversion.

44.

On March 18, 2014, 15 business days after Canouse gave notice of conversion, APWC shares traded at a daily average of $2.30.

45.

APWC's failure to honor Canouse's conversion notice issued on February 25, 2014 damaged Canouse in an amount to be proven at trial, but not less than $354,000.

46.

On May 29, 2014, Mr. Canouse gave notice of conversion of 5,000 Preferred Shares to 500,000 common shares.

47.

On June 19, 2014, 15 business days after Canouse gave notice of conversion, APWC traded at a daily average of $1.68.

48.

APWC's failure to honor Canouse's conversion notice issued on May 29, 2014 damaged Canouse in an amount to be proven at trial, but not less than $840,000.

49.

On June 3, 2014, Mr. Canouse gave notice of conversion of 4,000 Preferred Shares to 400,000 common shares.

50.

On June 24, 2014, 15 business days after Canouse gave notice of conversion, APWC traded at a daily average of $1.87.

51.

APWC's failure to honor Canouse's conversion notice issued on May 29, 2014 damaged Canouse in an amount to be proven at trial, but not less than $748,000.

52.

Based upon the notices of conversion already ignored by APWC, Canouse has been injured in an amount to be proven at trial, but not less than a total of $1,942,000.

## CULBRETH'S ADDITIONAL MISCONDUCT

53.

Upon information and belief, Culbreth is abusing his role as an officer and director of APWC.

54.

Culbreth is intentionally refusing to honor Canouse's notices of conversions in favor of other shareholders.

55.

Culbreth is intentionally issuing shares in APWC to his friends and relatives and allowing them to be sold to the detriment of Canouse.

56.

Culbreth is causing the issuance of shares in APWC to his personal creditors and those of other unrelated entities he is affiliated with to satisfy those non-APWC debts.

57.

Culbreth is intentionally and wrongfully refusing to honor Canouse's conversion notices in an illegal and improper effort to manipulate share prices to his own benefit and to the detriment of Canouse.

58.

Culbreth is the sole officer of APWC, filling the roles of president, secretary and treasurer.

59.

Culbreth is a director of APWC.

60.

APWC is completely controlled by Culbreth.

61.

Culbreth is using APWC as his alter ego such that they share a unity of interest.

62.

As an example, Culbreth's is causing APWC to refuse to honor Canouse's conversion notices while at the same time freely permitting transactions that are to his personal benefit.

63.

Culbreth, through use of his role as officer and director of APWC, is abusing the corporate form to funnel shares to himself, his friends, family, and creditors for his own personal benefit.

64.

By and through his conduct, Culbreth is funneling money out of the company, decreasing the stock marketability, manipulating the stock price, and harming innocent shareholders.

65.

Culbreth's siphoning of value from APWC will result in a valueless and judgment proof shell because the value will have been moved to Culbreth personally.

66.

Accordingly, adherence to the corporate fiction will allow Culbreth to commit fraud and injustice upon Canouse and other innocent shareholders.

67.

Culbreth admitted his intentional and illegal stock manipulation scheme on several occasions.  A true and correct copy of an email exemplifying the scheme is attached hereto as Exhibit C.

**CONVERSION OF CANOUSE'S PREFERRED SHARES**

68.

As re-affirmed by the Separation Agreement, in addition to the notes, the Corporation was obligated to issue an additional 1,175,000 Preferred Shares to Mr. Canouse with an issuance date of March 31, 2013.

69.

Although APWC did not issue a certificate, Canouse always believed that the certificate would be issued or his notices of conversion honored.

70.

Recently, in an apparent effort to deny Canouse the ability to convert his Preferred Shares, Culbreth, purportedly acting for APWC, reduced the number of authorized shares.

71.

On July 25, 2014, by and through its counsel Lacy Hofmeyer, APWC gave its first and only notice to Canouse that it does not intend to honor its

obligation to issue the 1,175,000 Preferred Shares.  A true and correct copy of that notice is attached hereto as Exhibit D.

## COUNT I

## BREACH OF CONTRACT

72.

Canouse hereby re-alleges and re-states the allegations contained in paragraphs 1- 71 as if fully restated.

73.

APWC entered into valid and binding contracts with Canouse to issue certain shares, convert those shares, and pay certain debts.

74.

APWC failed to honor its obligations as re-affirmed in the Separation Agreement.

75.

APWC's failure and refusal to perform the obligations re-affirmed in the Separation Agreement are breaches of contract entitling Canouse to recover damages.

76.

Canouse's damages arising from and proximately caused by APWC's wrongful conduct is an amount to be proven at trial but anticipated to be no less than $1.9 million.

77.

Canouse is entitled to a judgment against APWC for at least $1.9 million.

## COUNT II

## CONVERSION

78.

Canouse hereby re-alleges and re-states the allegations contained in paragraphs 1- 71 as if fully restated.

79.

APWC had, at all times relevant, possession, custody and control of 1,175,000 Preferred Shares belonging to Canouse.

80.

APWC was required to issue a certificate to Canouse for the 1,175,000 shares.

81.

APWC failed and refused to issue the certificate to Canouse.

82.

Instead, APWC used Preferred Shares that should have been issued to Canouse for other purposes, thereby converting Canouse's shares to its own use.

83.

Canouse demanded the issuance of his Preferred Shares such that they would be in his control and no longer under the illegal dominion and control of APWC.

84.

APWC, despite demand and lacking lawful reason, exercised dominion and control over Preferred Shares belonging to Canouse.

85.

On July 25, 2014, by and through its counsel Lacy Hofmeyer, APWC gave notice to Canouse that it will not release control of Canouse's Preferred Shares.

86.

As a direct and proximate result of APWC's wrongful conversion of Canouse's 1,175,000 Preferred Shares (convertible to 117,000,000 common

shares), Canouse has been damaged in an amount to be proven at trial, but believed to be valued at no less than $10 million.

## COUNT III

## CULBRETH'S BREACHES OF DUTY

### 87.

Canouse hereby re-alleges and re-states the allegations contained in paragraphs 1- 71 as if fully restated.

### 88.

Culbreth, as an officer and director of APWC, owes a fiduciary duty to the shareholders of APWC.

### 89.

Culbreth, as an officer and director of APWC, owes APWC and its shareholders a duty of loyalty that requires he hold the interests of APWC shareholders above those of non-shareholders.

### 90.

Culbreth, by and through his conduct, violated his fiduciary duty and dduty of loyalty.

91.

As a direct and proximate result of Culbreth's conduct, he is personally liable for all damages suffered by Canouse and described herein.

**COUNT IV**

**ATTORNEYS' FEES PURSUANT TO O.C.G.A §13-1-11**

92.

Canouse hereby re-alleges and re-states the allegations contained in paragraphs 1- 71 as if fully restated.

93.

The debts memorialized by the Notes and owed by APWC to Canouse include attorneys' fees provisions.

94.

Canouse gave all required notice and safe harbor periods to APWC as required by Georgia law.

95.

APWC did not pay the amounts due within the ten (10) days allowed by law.

96.

Accordingly, APWC is liable to Canouse for 10% of the amounts due and owing as statutory attorneys' fees.

97.

The Stock Purchase Agreement by which APWC was originally obligated to issue Canouse the shares described herein includes a Florida attorneys' fees provision.  Canouse also seeks to recover fees pursuant to that clause and applicable Florida law.

## COUNT V

## ATTORNEYS' FEES PURSUANT TO O.C.G.A §13-6-11

98.

Canouse hereby re-alleges and re-states the allegations contained in paragraphs 1- 71 as if fully restated.

99.

APWC and Culbreth have, by and through their conduct described herein, been stubbornly litigious, acted in bad faith, and caused Canouse unnecessary trouble and expense.

100.

Accordingly, APWC and Culbreth are jointly and severally liable to Canouse for his reasonable attorneys' fees and expenses.

101.

Canouse's attorneys' fees and expenses will be proven at trial.

## COUNT VI

## PUNITIVE DAMAGES

### 102.

Canouse hereby re-alleges and re-states the allegations contained in paragraphs 1- 71 as if fully restated.

### 103.

Culbreth's  actions showed willful misconduct, malice, fraud, wantoness, oppression, and the entire want of care which raises the presumption of conscious indifference to consequences.

### 104.

Accordingly, Canouse is entitled to an award of punitive damages against all Culbreth in an amount to be determined by the enlightened consciousness of the jury.

**WHEREFORE,** Plaintiff prays that he be granted:

(A)    That he be granted trial by jury of twelve on all issues so triable;

(B)    That he be granted judgment in his favor and against defendants for all amounts sought above;

(C)    That he be granted reasonable attorney's fees and expenses;

(D)     That he be granted all such other relief as the court may deem

just and appropriate.


Respectfully submitted this 31st day of July, 2014.


Fried & Bonder, LLC

/s/Scott L. Bonder

Scott L. Bonder

Georgia Bar No.  066815

White Provision, Suite 305

1170 Howell Mill Road, N.W.

Atlanta, Georgia 30318

Telephone:  (404) 995-8808